UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: ZIMMER NEXGEN KNEE IMPLANT PRODUCTS LIABILITY LITIGATION | ) ) ) ) | MDL NO. 2272 |
| | | Master Docket Case No.: 1:11-cv-05468 |
| This Document applies to: *Beverly Goldin*, 1:12-cv-02048 | ) ) ) | |
| | | Honorable Rebecca R. Pallmeyer |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S RULE 50 MOTION**

## **TABLE OF CONTENTS**

**TABLE OF AUTHORITIES………………………………………………………………ii**

    **I.     TESTIMONY OF DR. BAL……………………………………………………...1**

    **II.    DISCUSSION………………………………………………………………….10**

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Davis v. Wyeth*

   399 F.2d 121 (9th Cir. 1968) ............................................................................................. 12

*DiBartolo v. Abbott Labs*

   914 F.Supp 2d 601(SDNY 2012) ....................................................................................... 14

*Fane v. Zimmer*

   927 F.2d 124 (2d Circuit 1991 ............................................................................................ 14

*Lindsay v. Ortho Pharm. Corp*

   637 F.2d 87 (2d Cir. 1980). ................................................................................................ 12

*Wyeth v. Levine*

   129 S. Ct 1187 (2009) ......................................................................................................... 4

**STATE CASES**

*Baker v. St. Agnes Hosp.*

   70 A2d 400 ................................................................................................................. 11, 12

*Martin v. Hacker*

   83 N.Y.2d 1,628 N.E.2d 1308 (1993) ........................................................................ 10, 11

*McFadden v. Haritatos*

   86 AD2d 761, 448 N.Y.S.2d 79 (1982) ............................................................................. 12

Defendant has moved for judgment as a matter of law contending that the evidence adduced at trial is insufficient in multiple ways to permit a jury to find either liability or causation. Plaintiff disputes Defendant's contentions and urges the court to deny the motion and let the case proceed to the jury for resolution.

I. **TESTIMONY OF DR. BAL**

Dr. Sonny Bal first testified as to his education, training and experience in the field of orthopedic surgery as well as knee implant surgery specifically. He further explained his expertise in reading and utilizing Medical Device labeling and warnings and specifically those of Zimmer. Plaintiff's counsel moved to have him approved as an expert and the court agreed. He agreed to base all opinions on reasonable medical certainty.

Dr. Bal was shown Zimmer's patient package insert for the devices at issue (the labeling) and was walked through every line of information in the labeling beginning with the contraindications section. After reviewing the Contraindications section, he testified as follows:

(TR. 429:23-430)

Q. And is there anything in this particular section that contraindicates the use of this device in people that either obese or morbidly obese?

A. No

In response to the lack of warning in the contraindications section, he initially opined that the NexGen LPS should be contraindicated in morbidly obese patients. (Tr. 430:6-9). After Zimmer's objection to that comment Dr. Bal was asked the following:

(Tr. 431:19-432:6)

1

Q. And I believe in your report, you never stated that you are recommending to this jury that it be contraindicated. Rather, you stated that you recommended that warnings should be used?

Q. Is that clarification correct?

A. That I never said it's contraindicated but at least a warning should be issued?

Q. Yes

A. Absolutely, yes.

Dr. Bal is clearly opining that in the absence of warning in the contraindications section, a warning is necessitated in the warnings section. The labeling is in evidence (DEF Ex. 1446) and the jury was being shown the actual wording of the label during this examination. It was pointed out specifically that there is no contraindication regarding obesity or morbid obesity, nor is the risk of loosening or early failure of the device mentioned.

Dr. Bal next moved to the "Warnings" section and went line through line through every sentence in that portion of the labeling, none of which contained the words early loosening, early device failure, heavy, obese or morbidly obese.

He also confirmed that since 1993 the world's epidemiology has considered the issue of obesity and its survival rate in knee prosthesis and that Zimmer would have been in a position to do its own study. (Tr. 440-441). In several sentences in the warnings section, Dr. Bal pointed out that Zimmer provides statements that certain results are unknown, none of which relate to obesity and morbid obesity. Dr. Bal testified that comments such as those in the warnings section are important in the shared decision making between the surgeon and patient. (Tr. 446-447) The jury has ample evidence to infer that had that information been provided it would have been

2

heeded. New York law recognizes a heeding presumption. In fact, the plaintiff testified specifically to that point.

Finally, after going through every line of the warnings section, Dr. Bal testified as follows:

(Tr. 450: 24-451:4)

Q. With regard to the warning section and the NexGen package patient insert that was in effect at the time that Ms. Goldin had her implantation surgery, is there any warning whatsoever regarding the use of this device in obese, morbidly obese patients?

A. No.

Dr. Bal followed the same course of testimony regarding the precautions section of the labeling. (Tr. 452:11-15)(Tr. 453-454). He also testified that there was enough published data in the world's epidemiology by 2009 that failures had been seen in total knee arthroplasty in the tibial component as a result of obesity and morbid obesity and that at a minimum Zimmer could have said that in the warning section. (Tr.454:14-455:8)

This is competent testimony that the jury can rely upon in determining whether or not Zimmer failed to warn of the risk of early failure in the obese and morbidly obese populations using their NexGen knee products. It is plaintiff's contention in this case, and has always been, that the Zimmer label provides no warning whatsoever of the risk of early implant failure in the obese and morbidly obese populations in the Contraindications, Warnings and Precautions section of the label.

Zimmer does not warn of the risk of implant loosening and need for revision at all in the "Warnings", or "Precautions" sections.

3

As for the Adverse Effects section, Dr. Bal characterizes these as, "Bad things can happen" and "potential injury". He is then asked,

Q. All right. And is the loosening that they describe in the adverse effects described as a result of any particular activity in terms of the surgery, how it's performed or anything else?

A. No, it's just a generic description of a risk.

Q. And is that a warning to the physicians that a risk of loosening would exist in obese or morbidly obese patients that have these devices implanted?

A. No. (Tr. 452:24-453:7)

Dr. Bal considered the Adverse Effects section and determined that it too failed to warn. Dr. Bal testified regarding the complete lack of mention of obese and morbidly obese patients and any risks posed to them in the Contraindications, Warnings, Precautions and Adverse Effects sections, is tantamount to no warning at all. In this instance, the exact location where a warning should exist, the warnings or precautions section is silent. Dr. Bal later testifies that matters involving risk should be in the warnings section.

In *Wyeth v. Levine,*[1] the actual warning label warned of the danger of gangrene and amputation following inadvertent intra-arterial injection. Nonetheless, Levine alleged that the labeling was defective because it failed to instruct clinicians to use the IV-drip method of intravenous administration instead of the higher risk IV-push method. Here, plaintiff alleges that Zimmer failed to warn of known or knowable failure of the device and required revision surgery in the obese and morbidly obese populations. The mere mentioning in the label about a the potential possibility of loosening neither defines the injury nor the circumstances of use that would lead to it. It simply does not constitute an adequate warning.

---

[1] *Wyeth v. Levine* 129 S. Ct 1187 (2009)

4

Dr. Bal next discussed the Patient Counseling section of the labeling and specifically addressed the sentence which reads, "Complications and/or failure of total knee prosthesis are more likely to occur in patients with unrealistic functional expectations, heavy patients, physically active patients and/or patients that fail to follow through the required rehabilitation program." He explained that Zimmer made no distinction between the variety of patients and that this was really no type of warning at all and just a general guideline, somewhat meaningless. (Tr. 457:2-458:6) But, just in case there was any dispute whatsoever about how this section should be characterized, Dr. Bal was asked the following:

(Tr. 459:7-11)

Q. And so getting back to this section, from your professional standpoint as an expert witness in this case, is this an adequate warning to a surgeon of the risk of failure in the obese and morbidly obese communities?

A. No, no.

He was further asked:

(Tr. 462:15-463:1)

Q. Getting back to the document, with regard to the patient counseling information, it then says, Excessive physical activity and injury can result in loosening, wear and/or fracture of the knee implant. Now, right there, did Zimmer have the opportunity and the ability to say obesity or morbid obesity can result in loosening, wear and/or fracture of the knee implant?

A. Yes

Q. They could have done that?

A. Yes

Q. But they chose not to, right?

5

A. Correct

Dr. Bal next discusses that in his review of the world's literature, the likelihood of failure is greater in the morbidly obese population than the obese population. Given Ms. Goldin's BMI in excess of 40 at implantation, she was morbidly obese.

Dr. Bal next turned to the only other document relied upon by Zimmer as a warning in the obese population, The Surgical Technique. He was directed to the patient selection section where he was asked questions about the statement, "The patient should not be obese" where he confirmed that the section does not contain the words warning or caution, nor does it discuss the implications of a revision surgery. (Tr.469:22-470:9)

He testified further:

(Tr.471:7-10)

Q. So does this surgical technique that's provided to the physician, does it provide a warning of failure of the device in the obese or morbidly obese population?

A. No.

On the issue of Zimmer diligence in testing as a basis for warning, Dr. Bal was questioned on this at Tr. 488:15-489:7.

Dr. Bal was questioned about the necessity of warning and its impact on patient decision making and testified as follows:

(Tr. 500:1-501:10)

A. You're exactly right. Where a serious complication occurs, and the literature is pretty clear that there's a concern, literature meaning more than one paper written by a credible authority that body weight may be contributing to it even if the knee is perfectly lined up, that should be a warning label. The surgeon may still do the operation. The patient may still accept

6

the risk of the operation. But in choosing to go through the operation or postponing it in favor of losing weight first, that is the patient's decision, and the patient has the right to know all of the information.

Q, Now let me ask you, had Zimmer placed information in their warning label, package patient insert, regarding the increased risk of failure in the morbidly obese population, do you believe that that's information Dr. Windsor would have passed along to her?

A. Yes.

Q. Is that information that Ms. Goldin was entitled to know?

A. She was. And if I were the surgeon, I would have told her that.

Q. And had they emphasized this particular issue to Ms. Goldin, would it have given her an opportunity to consider other options, such as losing a lot more weight before surgery?

A. Yeah. And that's a reasonable conclusion.

Q. Or possibly not undergoing the surgery at all?

A. That's true.

Q. Or possibly using a different type of device after adequate investigation?

A. That's true.

Dr. Bal gave the following additional opinion in response to questions in cross examination:

(Tr. 9:14-17)

Q. And as I understand your expert report and your testimony, you're critical of the use of the term "heavy." It's not accurate enough or well defined enough, in your view, correct?

A. Yes

(Tr. 10:8-13)

7

Q. And didn't you testify the purpose of our guide is to give the information to the surgeons so that they can have that conversation with their patients?

A. Correct. And you list a number of limitations in your warnings section. Nothing is captured there about obesity or heaviness.

Dr. Bal on redirect was questioned on the issue of performance of studies and responded as follows:

(Tr. 16, 17:2-4)

Q. And whose responsibility is it to study this and know something about it?

A. The manufacturer.

Dr. Bal was questioned specifically regarding the state of the science regarding the High Flex device:

(Tr. 19:22-21:2)

Q. Are concerns about High-Flex knee replacement, are those voiced in biomechanical and clinical studies?

A. Oh, yeah, they are.

Q. And in terms of those activities such as prolonged squatting or kneeling, are they risk factors for tibiofemoral loosening and osteoarthritis?

A. Sure they are.

Q. To what degree?

A. To multiples of your body weight. That's well known not just to orthopedic surgeons, but even to Web M.D. or whatever the heck you want to go on the Internet. Stair climbing generally hurts more. Squatting up and down hurts more in arthritic patients, as we grow older and we gain weight. And the reason is there's a multiplier effect, some six to eightfold in deep

8

knee flexion. And you can test this yourself. If you bend your knee real deep, it feels tight; or you try to go upstairs or if you gain ten pounds like I have and your knee starts hurting, because there's a multiplier every 10 pounds you gain. Conversely, if you lose a little bit of weight, you'd feel a whole lot better.

    Q. In terms of this issue regarding morbid obesity, as far as Zimmer's package insert is concerned, as far as the surgical technique is concerned, anywhere, if we read all of those, every word of them--and I'm sorry I went through them in such long detail, but I think it's important-- do they ever mention the word "morbid obesity".

    A. No, they don't. The proper section was where they were saying, "We just don't know." Do you remember that?

    Q. Yes

    The section Dr. Bal is referring to is the Warnings section in the Product Package Insert. Plaintiff has contended all along that there is absolutely no warning to the morbidly obese of the increased risk of failure. His testimony clearly establishes that no mention is ever made by Zimmer of the "morbidly obese", therefore, as plaintiff has contended previously, the question of adequacy is never actually ripe since no warning whatsoever exists. Dr. Bal has opined as to the absence of any warning in the contraindications, warnings, precautions and adverse effects section to the morbidly obese and the inadequacy and absence of warning in the "patient counseling" section and surgical technique, neither of which link obesity and/or morbid obesity to early failure or the risk of revision that he clearly testified was present in the literature before Ms. Goldin's surgery.

    This testimony coupled with Ms. Goldin's testimony that had adequate warnings concerning these risks been passed along to her, she would not have undergone the surgery,

9

rather she would have pursued other alternatives such as weight loss or potentially a different device furnishes the jury with adequate facts in dispute to render a verdict.

Finally, Dr. Windsor's consultation with Ms. Goldin prior to surgery is a matter of conflicting evidence. There is circumstantial evidence that calls his recollection of events into question. For instance, he admits probably not remembering Ms. Goldin and admitted that he wouldn't remember the surgery but for a review of his written record. His records fail to disclose any consultation regarding obesity as a risk factor for early loosening or device failure. He did testify that his prescribing practice changed a few years after this event, and now includes those things which suggests that improved warnings were adopted by him. On the other hand, Ms. Goldin denies that any such risk posed by her morbid obesity was ever conveyed to her by Dr. Windsor. Had he been furnished this information by Zimmer and passed it along to Ms. Goldin, the evidence supports the conclusion that she would have changed her decision and ultimate outcome.

**II. DISCUSSION**

*Martin v, Hacker*[2] has been described as the controlling authority in New York regarding failure to warn claims in the pharmaceutical and device arena. *Martin* involved the drug reserpine and it's alleged cause of Martin's suicide. The labeling in that case described "suicidal tendencies" in the Contraindications section. In the Warnings section the label stated, "Extreme caution should be exercised in treating patients with a history of mental depression…Discontinue the drug at first sign of despondency…Drug induced depression may persist for several months after drug withdrawal and may be serious enough to result in suicide."

---

[2] *Martin v. Hacker* 83 N.Y.2d 1,628 N.E.2d 1308 (1993)

Nonetheless, plaintiff's widow brought suit alleging a failure to warn and the court granted summary judgment which was upheld. The *Martin* court recognized comment k of Restatement 402A embracing the defense to liability if the drug is properly prepared and accompanied by proper directions and warning. *Martin* points out that the comment k defense is unavailable for products negligently manufactured, negligently distributed or unaccompanied by proper warnings. Plaintiff takes the position that comment k does not apply in this case since the evidence clearly shows that the product was unaccompanied by proper warnings. The manufacturer's duty is to warn of all potential dangers in its prescription drugs that it knew, or in the exercise of reasonable care, should have known to exist. To the extent that plaintiff has introduced evidence regarding testing it was submitted solely on the issue of what Zimmer should have known. Given Dr. Bal's discussion of available literature that would have placed Zimmer on notice and its duty to test and inspect its product, the jury can draw a reasonable inference that Zimmer's failure to test contributed to its failure to warn. (Citing *Baker v. St. Agnes; Lindsay v. Ortho Pharm. Corp. and Davis v. Wyeth*)[3]

The *Martin* court goes on to explain the learned intermediary doctrine and states, "The warning must provide sufficient information to that category of prescribing physicians who may be expected to have the least knowledge and expertise with the drug."

In relation to the hierarchy of FDA approved labeling, the court notes, "The Contraindications section includes the most stringent caveats against use, i.e. a statement of conditions under which the drug is not to be used. **Each succeeding section especially from Contraindications to Adverse Reactions, sets forth in a descending order of importance and seriousness of the attendant risks; thus, for example, the Warnings section deals with side**

---

[3] *Baker v. St. Agnes Hosp*. 70 A2d 400, *Lindsay v. Ortho Pharm. Corp*. 637 F.2d 87 (2d Cir. 1980); *Davis v. Wyeth* 399 F.2d 121 (9th Cir. 1968)

**effects of graver consequence than the Adverse Reactions section."** (Citing *McFadden v. Haritatos*)[4] Zimmer's reliance on a statement in the Adverse Effects section of the labeling can hardly be considered adequate. Dr. Bal contends it's no warning at all. Clearly, it fails to suggest the circumstances or usages that would cause loosening, if and when it would be anticipated, and the extent of surgery necessary to correct the defect in addition to its greater likelihood in obese and morbidly obese individuals.

Further *Martin* states, "A warning for a prescription drug may be held adequate as a matter of law if it provides specific detailed information on the risks of the drug. The court must examine not only the meaning and informational content of the language but also its form and manner of expression". This, once again implicates the placement of the comment regarding loosening in the Adverse Effects section rather than the Warnings and/or Precautions sections.

The *Martin* court found the labeling for reserpine that the Warnings section and Adverse reactions sections were sufficient to convey to any reasonably prudent physician an unambiguous and consistent message concerning the risk of suicide and summary judgment was granted. It should be noted that plaintiffs were arguing that comments in the Adverse Effects section of the labeling took away from the clear warning offered in the Warnings section and therefore created an ambiguity for the plaintiff, facts far different than *Goldin*. The *Goldin* court considered Zimmer's Motion for Summary Judgment and the facts giving rise to this case. Unlike *Martin*, where clear warnings as to the risks appeared in the Contraindications and Warnings sections, no similar facts exist here. Even after detailed testimony, the evidence establishes that no warning of loosening or premature failure in the obese and morbidly obese populations exists in the Contraindications, Warnings or Precautions sections whatsoever. The mention of loosening in

---

[4] *McFadden v. Haritatos* 86 AD2d 761, 448 N.Y.S.2d 79 (1982)

12

the adverse effects section is of no merit according to plaintiff's expert and draws no connection to the use of the product in the obese and morbidly obese and therefore presents a fact issue for jury consideration. As to the issue of duty, evidence exists through Travis Jarv Campbell, an employee of Zimmer, that 75-85% of the female patients receiving Zimmer implants are obese.

Other New York authority supports the court's ruling on summary judgment and argues in favor of denying this Rule 50 motion. "An important principle that follows from this analysis is that a warning does not adequately warn of a side effect simply by stating that the side effect may result from the use of the drug. Rather, a warning's adequacy depends on the specific manner in which the warning advises physicians of the risk that the side effect will materialize."[5] Unlike *Goldin*, Abbott's Humira had detailed, unequivocal and precise warnings against the products usage and injuries. Abbott was required to produce a Medication Guide that went to both physicians and patients. In Goldin, mere mention of loosening in the adverse effects section and "heavy" in the patient counseling information, a section of lowest warning priority, without conveying the danger in the obese and morbidly obese populations creates a fact issue for jury consideration.

Zimmer contends at page 10 of its brief that, "had Plaintiff received from Dr. Windsor the warnings about the increased risk of loosening in obese patients that Zimmer included in the materials provided to Dr. Windsor"…as if Zimmer ever provided any such warning. Zimmer cannot point to one sentence that includes the words loosening and obese or to even one paragraph that says as much. Zimmer cites *Fane v. Zimmer*[6] as factually similar to Goldin. *Fane*, like all of the other cases, actually contained a warning and the reasoning for granting directed verdict in that case varies wildly from the case sub judice. Supporting directed verdict in that

---

[5] *DiBartolo v. Abbott Labs* 914 F.Supp 2d 601(SDNY 2012)
[6] *Fane v. Zimmer* 927 F.2d 124 (2d Circuit 1991)

13

case was the plaintiff's failure to prove direct causation. The Fanes were unable to prove the breakage of the device caused the injuries sustained. In Goldin, there is universal agreement that her weight caused the device to subside into the tibia. Both her revising surgeon, Dr. Joel Buchalter and Dr. Sonny Bal so testified (Tr. 483-486)

      Zimmer suggests that Dr. Windsor failed to pass along its alleged warning and that was an intervening cause, severing the causal connection of the manufacturer to the plaintiff's injury. This is contrary to the actual testimony of Dr. Windsor where he was asked, "Are there any warnings provided to you, the physician, with regard to obesity", and answered "I do not see anything that states a warning to obese patients". (Dep. Tr. P.116) He also agrees that there is no warning in the Precaution section and when asked about the use of the term heavy in the patient counseling section he agrees that could mean many things. He further testified that he ordinarily passes along this kind of information. He says he would have counseled her about the reasonable time the product would last as 10-15 years. (Dep. Tr. P.120). This testimony is evidence that Zimmer failed to adequately warn Dr. Windsor of the risks posed in the obese and morbidly obese populations.

      As to Zimmer's contention that there was no constructive knowledge on the part of Zimmer regarding failure in the obese prior to 2009, Dr. Bal clearly relied on studies prior to 2009 and was asked as much several times in his testimony. In fact, he described the Berend/Ritter study from 2004 specifically. He mentioned the Moreland article from 1987 and the Weeden article of 2007 (Tr. 490:6-12) Earlier in his deposition, he was asked as follows: (Tr. 440:12-441:5)

      Q. And, Doctor, over your entire career, going all the way back to 1993, has the world's epidemiology—and I'm talking about published studies that have been peer reviewed by doctors,

14

that have been done by hospitals, that have been by any number of sources, all the way back to 1993--has the issue on obesity and its survival rate in knee prosthesis been discussed?

    A. Yes.

    Q. And are there literally numerous articles, going all the way back to 1993, when you began practice, that look at this from various angles?

    A. Yes.

    Q. And that world's literature, would it have been available to Zimmer?

    A. Correct.

    Q And would Zimmer have been in a position to do its own study to determine whether or not a particular product posed a risk of failure in an obese or morbidly obese patient?

    A. Yes.

He was questioned later about the studies:

(Tr. 464:4-13)

    Q. In your review of the literature, and I'm talking about the world's literature regarding this issue, is the likelihood of failure greater in the obese population or the morbidly obese?

    A. The morbidly obese, that's the highest.

    Q. And those are people with a BMI over 40?

    A. Correct.

    Q And that would include Ms. Goldin at the time that she had her surgery?

    A. Correct.

    Dr. Bal also discussed the impact of weight on the device and the lack of information provided by the manufacturer as of 2009. (See Tr. 488:15-489:7). Plaintiff stands by its previous

pleading on the medical bill issues also raised in the rule 50 motion and disputes any other matters alleged therein in support of their motion for directed verdict.

In conclusion, Plaintiff has offered sufficient evidence on all of the issues necessary for jury consideration. Zimmer has indicated that it intends to call an FDA expert to suggest to the Jury that it somehow was prohibited from performing testing in live patients, referred to as clinical testing. In fact, nothing in the FDA regulations prohibit a manufacturer from testing and inspecting its product. Since such testimony may leave the inference that FDA approval is all that was necessary, plaintiff requests that the jury be charged as follows:

In keeping with Congress' decision not to pre-empt common-law tort suits, it appears that the FDA traditionally regarded state law as a complementary form of drug regulation. The FDA has limited resources to monitor the 11,000 drugs on the market,[11] and manufacturers have superior access to information about their drugs, especially in the postmarketing phase as new risks emerge. State tort suits uncover unknown drug hazards and provide incentives for drug manufacturers to disclose safety risks promptly. They also serve a distinct compensatory function that may motivate injured persons to come forward with information. Failure-to-warn actions, in particular, lend force to the FDCA's premise that manufacturers, not the FDA, bear primary responsibility for their drug labeling at all times. Thus, the FDA long maintained that state law offers an additional, and important, layer of consumer protection that complements FDA regulation. (*Wyeth v. Levine*, supra)

                                                  Respectfully Submitted,

                                                  /s/ James Morris
James A Morris Jr
Morris 6310 San Vicente Blvd. STE 360Law Firm
Los Angeles, CA 90048
323-302-9488
jmorris@jamlawyers.com

16

## **CERTIFICATE OF SERVICE**

This certifies that a foregoing true and correct copy of this pleading was served on Defendant Zimmer by and through its counsel on January 22, 2017.

                                                                /s/ James Morris
                                                                James A Morris Jr